**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

**v.**                                                                                   **5:05-CR-322(NAM)**

**WILLIAM ROBINSON,** *et al.***,**

      **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| Aswad & Ingraham<br>46 Front Street<br>Binghamton, New York 13905 | Thomas R. Cline, Esq. |
| Glenn T. Suddaby<br>United States Attorney<br>P.O. Box 7198<br>100 South Clinton Street<br>Syracuse, New York 13261-7198 | John M. Katko,<br>John G. Duncan,<br>Assistant United States Attorneys |

**Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.     INTRODUCTION**

On August 1, 2005, United States Magistrate Judge Gustave J. DiBianco issued a warrant authorizing, *inter alia*, the search of defendant William Robinson's residence, 738 West Onondaga Street, Apartment 2, in Syracuse, New York. Law enforcement officers executed the search warrant on August 2, 2005. Presently before the Court is defendant's motion[1] to suppress

---

[1] Near the caption of his motion papers, defendant states that "No Speedy Trial Exclusions Apply" to this motion. The Speedy Trial Act requires that the trial of a defendant "commence within seventy days from the filing date . . . of the . . . indictment, or from the date the defendant has appeared before a judicial officer . . . whichever date last occurs." 18 U.S.C. § 3161(c)(1). Pursuant to § 3161(h)(1)(F), any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excluded from the speedy trial clock. Moreover, "delay attributable to any one defendant is charged against the single clock," *United States v. Pena*, 793 F.2d 486, 489 (2d Cir. 1986); *see also* §3161(h)(7). Thus, as with all other motions in this case, the delay attributable to this motion is excluded from the speedy trial clock and is charged against all defendants.

all physical evidence law enforcement seized during their search of his residence. The government opposes defendant's motion.

## II.     BACKGROUND

On July 20, 2005, defendant and fifteen others were charged in a one-count indictment with conspiracy to engage in a pattern of racketeering activity as part of their alleged membership in the Elk Block gang, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). On August 1, 2005, the government applied for a warrant to search, *inter alia*, defendant's residence for evidence of drug paraphernalia and documents related to drug distribution, phone records and address books, bank records, currency, photographs or other gang-related matter, pagers or cell phones, computer equipment, and evidence of the association and relationship of individuals in connection with gang or drug-related activity. The government supported the warrant application with an affidavit by Detective Sergeant Kevin Murphy of the Onondaga County Sheriff's Office and a copy of the indictment in this case. Regarding 738 West Onondaga Street, Apartment 2, Detective Murphy averred:

> The photograph attached to the search warrant was taken today, August 1, 2005, and it accurately depicts this building. This is a multi-unit apartment complex located on the east side apartment building on West Onondaga Street. The number "2" is clearly displayed on the mailbox next to the front door.
>
> Defendant William Robinson is believed to live at this address. As demonstrated in Overt Acts 9, 13, 26, 32, 37, 42, 44, 52 and 53, Robinson has a long history with Elk Block that includes drug dealings and shootings. Earlier today, the aforementioned [cooperating witness] confirmed that he was in the basement bedroom of this apartment last Saturday with Robinson, that it was Robinson's bedroom, and that he personally observed a handgun kept behind a television in the room. Robinson's mother, Shelly Robinson, is the listed renter of this apartment. Additionally, Onondaga County Detective Matthew Hayes has encountered Robinson at this address pursuant to numerous prior criminal investigations.

As stated, Magistrate Judge DiBianco issued the search warrant on August 1, 2005. During their execution of the search warrant the following day, law enforcement seized, among other things: several rounds of ammunition; defendant's Sheriff's identification; Elk Block pictures; and a newspaper article regarding the murder of Demetrius Elmore. Defendant moves to suppress all evidence seized from his apartment.

### III. DISCUSSION

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also* Fed.R.Crim.P. 41. In reviewing a magistrate's probable cause determination, the Court must "accord substantial deference to the magistrate's finding and limit . . . review to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Singh*, 390 F.3d 168, 181 (2d Cir. 2004). "To establish probable cause to search a residence, two factual showings are necessary-first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (citing *United States v. Harris*, 403 U.S. 573, 584 (1971)).

In this case, the warrant application provided a substantial basis for the finding of probable cause. In his affidavit, Detective Murphy recited facts from the indictment, appended the indictment to the application, and incorporated the indictment by reference into his affidavit. The indictment charged defendant and others with conspiracy to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity consisting of multiple acts involving murder, conspiracy to possess with intent to

3

distribute and distribution of crack and marijuana, and witness tampering, in violation of 18 U.S.C. § 1962(d).  The indictment also charged that:

> The Elk Block gang operates within a multi-block area on the south side of the City of Syracuse, New York, that is in and around Elk Street.  Elk Block members routinely guard that territory and resort to acts of violence, if necessary, to ensure that no rival gang members encroach upon their territory to sell drugs, or for any other reason. If a non-Elk Block member attempts to sell crack within their territory, either on their own, or in conjunction with a rival gang, they will be summarily dismissed from the area and, likely, physically assaulted, stabbed, or shot. Rival gang members have been assaulted, stabbed or shot if they were seen in Elk Block territory, even if they were not dealing drugs. By tightly controlling their defined geographic area, Elk Block members maintain an exclusive territory within which only Elk Block members can distribute their crack cocaine.
>
> For the vast majority of Elk Block gang members, the sale of crack cocaine is their sole source of income. Some of the more senior members of Elk Block act as crack cocaine suppliers for the younger members, who sell crack cocaine on the streets, thereby insulating somewhat the more senior members of Elk Block from exposure to criminal liability. When the younger members sell the crack cocaine, they keep a portion of the proceeds as a profit for themselves and use the balance to buy more crack cocaine from the senior members of Elk Block. The senior members of Elk Block routinely pool their money and make, or arrange for others to make, trips to New York City on a regular basis to obtain additional quantities of crack cocaine.
>
> Elk Block gang members are expected to project a violent attitude in order to ensure that the gang's territory is protected. They are also expected to retaliate with acts of violence when rival gang members commit acts of violence against one or more Elk Block members. The Elk Block members believe that if this projection of violence and strong retaliation when acts of violence are committed against one of their members is not done, then their stature within the gang community in Syracuse would be lessened and their territory would be threatened.
>
> The letter "E" is the call sign for Elk Block. Elk Block gang members use a hand sign forming an "E" to represent gang identity, which can be flashed in three different ways. Elk Block gang graffiti is located on various buildings in their territory and is there to serve notice that Elk Block exists and that they have a territory. In the late 1990's Elk Block members adopted a sign or "flag" - a cream colored bandana – which indicated to others that they were members of Elk Block.  Some of the gang members have large tattoos on their bicep/tricep area which have the words "Elk Block" or "Elk" clearly displayed. Some others have tattoos honoring deceased gang members, such as Demetrius Elmore, aka Tinker or Tink, who were murdered by rival gangs.

4

> Elk Block members routinely arm themselves with firearms in order to protect their territory, to protect their drug trade, to project a violent attitude to rival gang members, and to retaliate against any rival gangs who committed acts of violence against any Elk Block gang members.
>
> Key factors which decide whether one is allowed in as a member of Elk Block include: familial affiliation with a current gang member; seniority in the gang; demonstrating an ability to sell large quantities of crack cocaine on the street; and demonstrating a willingness to engage in violent behavior to further the gang's drug trafficking activities and to protect its territory.
>
> Elk Block gang members are often supported by other gang members upon their arrest through payments of lawyers fees. They also, on occasion, use drug-derived proceeds to bribe and attempt to bribe, key witnesses to crimes Elk Block gang members have committed in an effort to get them to change their testimony or refuse to testify. They also, on occasion, engage in intimidating tactics against those witnesses, such as issuing threats and physical violence if they opt to testify.
>
> In addition to meeting on a regular basis to pool their drug money so that senior Elk Block members can travel to New York City to obtain additional quantities of crack cocaine, Elk Block members also hold meetings when significant events within the gang occur. These meetings often center around issues such as retaliation against rival gang members and planning criminal activities. The meetings most often take place in the 200 block of McKinley Street, which is a dead end, so that they could easily spot intruders or law enforcement.  These meetings are dominated by individuals within the gang who have gained status, based upon longevity within the gang, their considerable success in drug sales, and/or their propensity to project a violent attitude.
>
> The senior members of Elk Block that maintain a leadership position within the gang include Billy Applins, a/k/a "Gee"; "Billy Pringle," and James Kelly, a/k/a "Boom," among others. Applins and Kelly often cajole younger gang members to "put in work" for the gang, which means to get them to engage in violent acts or deal more drugs. Applins and Kelly, on occasion, offer ounce and multi-ounce quantities of crack cocaine if other gang members engaged in violent acts on behalf of the gang.

Further, the eighteen-page indictment detailed defendant's involvement with the Elk Block gang and his participation in ten of the alleged overt acts, including the possession of cocaine base (crack) and marijuana and attempted murder.  Thus, based on the indictment, Magistrate Judge DiBianco had an ample basis on which to find probable cause to believe defendant was engaged in a RICO conspiracy.  *See United States v. Seybold*, 726 F.2d 502, 505

(9th Cir. 1984) (holding that although "[a] grand jury's determination that sufficient evidence of guilt exists to indict an individual may not necessarily mean that evidence of that person's guilt will likely be found in his residence" when a search warrant application includes the indictment itself, "a magistrate may apply his independent judgment to the factual allegations in an indictment to determine whether probable cause for a search warrant exists."); *United States v. Windrix*, 405 F.3d 1146, 1153 (10th Cir. 2005) (holding that the affidavit in support of the search warrant, which incorporated the "allegation in the original indictment against Defendants that they had conspired to manufacture and distribute methamphetamine", "provided probable cause to believe that Defendants were drug traffickers"). Accordingly, the Court must consider whether Magistrate Judge DiBianco had a substantial basis for finding probable cause to believe evidence of a RICO conspiracy would be found in defendant's residence.

Defendant asserts that the Court should excise the statement in the warrant affidavit based on information from a cooperating witness because the affidavit contains no indication that the cooperating witness is reliable. In the affidavit, Detective Murphy states: "Earlier today, the aforementioned [cooperating witness] confirmed that he was in the basement bedroom of this apartment last Saturday with Robinson, that it was Robinson's bedroom, and that he personally observed a handgun kept behind a television in the room." In *United States v. Wagner*, the Second Circuit explained that:

> [t]he core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence. If a substantial amount of information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that he provides, though uncorroborated, is also reliable.

6

989 F.2d 69, 72-73 (2d Cir. 1993).

Here, the warrant application identifies the informant as a "cooperating witness" "from the Elk Block Gang". Detective Murphy avers that the informant "has provided substantial information about the Elk Block Gang", which authorities have corroborated. Thus, it is permissible to infer the cooperating witness's reliability. In any event, the affidavit contained additional information which supports Magistrate Judge DiBianco's conclusion that there was probable cause to believe evidence of a RICO conspiracy was located at defendant's residence. For example, Detective Murphy stated in the affidavit that defendant's mother was the listed renter of the apartment and that Onondaga County Detective Matthew Hayes "has encountered Robinson" at the residence "pursuant to numerous prior criminal investigations." Moreover, as laid out in the affidavit, Detective Murphy is an experienced law enforcement officer with extensive training regarding gangs. Detective Murphy is assigned to the Syracuse Gang Violence Task Force and has "been heavily involved in the investigations and federal prosecutions of the Boot Camp Gang [and] the North Side Bloods". Based on his training and experience, Detective Murphy has considerable knowledge "as to the inner workings of street gangs, and the habits and customs of gang members." Relying on his knowledge, experience and investigation, Detective Murphy stated that gang members maintain in their residences documents relating to their drug trade, currency to maintain their drug business, drugs, address books with the telephone numbers of their drug and gang associates, photographs and videotapes of themselves and their associates, drug paraphernalia, and firearms. An agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application. *United States v. Young*, 745 F.2d 733, 758 (2d Cir. 1984). This information, together with the remainder of the affidavit and indictment

attached to the search warrant application, is more than sufficient to establish probable cause to believe that defendant was involved in a RICO conspiracy through his membership in the Elk Block gang and that evidence of the RICO conspiracy would be found in his residence. Accordingly, defendant's motion to suppress is denied.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that defendant William Robinson's motion to suppress physical evidence is **DENIED.**

**IT IS SO ORDERED.**

DATE:  November 17, 2006

Norman A. Mordue
Chief United States District Court Judge